# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 4, 2001 Session

## HECK VAN TRAN  v.  STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. P-14409     Hon. John P. Colton, Judge**

---

**No. W2000-00739-SC-R11-PD - Filed December 4, 2001**

---

WILLIAM M. BARKER, J., with whom JANICE M. HOLDER, J., joins, concurring in part, dissenting in part.

With its decision today, a majority of this Court has effectively permitted a defendant, who was sentenced to death in 1989 for the brutal execution of a 74-year-old grandmother, an opportunity to escape the ultimate punishment for his actions solely because he has managed to obtain a lower score on a revised I.Q. test than he was previously able to do. Before today, the Constitution of this State has never been held to provide blanket capital immunity to a class of persons based only on the *fact* of low intellectual ability and deficits in adaptive behavior. Instead, the Constitution has barred such executions only when the defendant's mental condition displaces the following capacities: (1) the *cognitive capacity* to appreciate that certain action will lead to the death of others; (2) the *moral capacity* to appreciate the wrongfulness of murder; or (3) the *volitional capacity* to behave in a lawful manner.

By permitting Heck Van Tran the opportunity to escape his capital sentence because of his new score on an I.Q. test, the majority ignores that Heck Van Tran has not argued that his alleged condition ever affected his abilities to appreciate that certain actions would lead to the death of others. The majority ignores that Heck Van Tran has not argued that his alleged condition ever affected his ability to appreciate the wrongfulness of murder. The majority also ignores that Heck Van Tran has not argued that his alleged condition ever affected his ability to behave in a lawful manner. Instead, the majority holds that Heck Van Tran should escape his capital sentence because his new score on an updated I.Q. test *removes his moral blameworthiness* for the senseless and intentional execution of an elderly victim, Kai Yin Chuey. I simply cannot agree.

Moreover, the majority has completely disregarded the petitioner's claims alleging "new scientific evidence establishing that [he] is actually innocent of the offense or offenses for which [he] was convicted" under Tennessee Code Annotated section 40-30-217(a)(2). Instead, the majority has

determined that the motion to reopen is "more appropriately" based on the provisions of Tennessee Code Annotated section 40-30-217(a)(1), which provides in pertinent part that the "claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial." Although the majority has extended this very narrow basis to reopen to apply in this case, the constitutional issue now raised for the first time in this motion to reopen has clearly been *waived* by the petitioner's failure to raise it in his original post-conviction petition. See Tenn. Code Ann. § 40-30-206(g). In accordance with our holding in State v. West, 19 S.W.3d 753 (Tenn. 2000), this Court lacks the authority to consider this constitutional issue, and it should therefore be dismissed. Accordingly, because subsection (a)(1) is not an applicable avenue for relief in this case, the petitioner must seek relief on other grounds.

Indeed, the petitioner filed his motion to reopen pursuant to subsection (a)(2), alleging that an updated version of the I.Q. test has established his mental retardation thereby rendering him "actually innocent" of capital punishment. This Court has not previously considered the proper standards governing the admissibility of "new scientific evidence" under Tennessee Code Annotated section 40-30-217(a)(2). Consequently, it is inappropriate for the petitioner to assume that the WAIS-III qualifies as such without further inquiry. I also disagree that the language "actual innocence of the offenses for which he was convicted" in this subsection includes innocence of, or ineligibility for, the death penalty. Accordingly, I am unable to join the majority's decision permitting the petitioner to reopen his post-conviction petition under either subsection (a)(1) or, per the petitioner's request, subsection (a)(2), and for the reasons given below, I respectfully dissent.

A review of the factual history of this case will provide a better understanding of the procedural and substantive issues before the Court:

## FACTUAL BACKGROUND

In 1987, during the course of robbing a family-owned restaurant, the petitioner and three other defendants shot and killed three innocent victims, all family members. A fourth family member was brutally beaten but eventually recovered. The evidence at the petitioner's trial revealed that he shot two of the victims, including seventy-four year-old Kai Yin Chuey, multiple times including once in the throat and once in the back of the head. State v. Van Tran, 864 S.W.2d 465, 469 (Tenn. 1993). The petitioner then entered the restaurant office where he knew valuables were kept, and he stole gold and jewelry having an estimated wholesale value of $25,000.

Following the robbery, three of the criminals took most of the stolen jewelry and fled to Houston, Texas. There, the defendant managed to sell some of the stolen gold for $4,000, which the trio divided amongst themselves. For almost six months after the robbery, the petitioner remained in hiding until he was arrested in Houston. At the time of his arrest, the petitioner initially gave the police a fictitious name upon inquiry. After he was advised of his *Miranda* rights, he was asked if he knew why he was being arrested, to which he replied, "For a shooting in Memphis." Later, the petitioner gave a written statement in which he admitted his involvement in the crimes.

The jury found him guilty of three counts of first degree murder and one count of robbery by use of a deadly weapon and sentenced him to death for each of the murder convictions. The court also sentenced the petitioner to thirty years imprisonment for the robbery to be served concurrently with the death sentences. On appeal, his convictions and one death sentence were affirmed by this Court.

On March 7, 1995, the petitioner filed a petition for post-conviction relief alleging, among other things, that he was mentally retarded and thus ineligible for the death penalty under Tennessee Code Annotated section 39-13-203. The trial court conducted an evidentiary hearing in October 1997. At the hearing, the petitioner presented the testimony of Dr. Andrew J. Adler, the psychologist who tested the petitioner using the Vineland Adaptive Behavior Scale and the Wechsler Adult Intelligence Scale–Revised (WAIS-R). Dr. Adler testified that the petitioner had deficits in adaptive behavior that had manifested during the petitioner's developmental period and that the petitioner had a full-scale I.Q. of sixty-seven. He concluded that Van Tran was therefore mentally retarded as defined by section 39-13-203(a).[1] However, the State's expert, psychologist Dr. Lynn Zager, testified that Dr. Adler's calculations of the WAIS-R test scores were erroneous and that the petitioner's I.Q. was actually seventy-two. Following the hearing, the post-conviction court found Dr. Adler's calculation to be in error and dismissed the petition. The Court of Criminal Appeals affirmed the trial court's dismissal and further held that a proceeding for post-conviction relief is inappropriate for addressing the issue of present incompetency to be executed. On November 23, 1999, this Court affirmed the dismissal of the post-conviction petition. Van Tran v. State, 6 S.W.3d 257, 261 (Tenn. 1999).

Within a month after this Court's decision to affirm the dismissal of the post-conviction petition, Dr. Adler again tested the petitioner using the Wechsler Adult Intelligence Scale-III, an updated version of the WAIS-R. Dr. Adler determined that the results of this test showed that the petitioner's full-scale I.Q. was sixty-five. Relying on this information, the petitioner then filed a

---

[1] Section 39-13-203 provides in pertinent part:

(a) As used in this section, "mental retardation" means:

    (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;

    (2) Deficits in adaptive behavior; and

    (3) The mental retardation must have been manifested during the developmental period, or by eighteen (18) years of age.

(b) Notwithstanding any provision of law to the contrary, no defendant with mental retardation at the time of committing first degree murder shall be sentenced to death.

(c) The burden of production and persuasion to demonstrate mental retardation by a preponderance of the evidence is upon the defendant. The determination of whether the defendant was mentally retarded at the time of the offense of first degree murder shall be made by the court.

motion to reopen his previous post-conviction petition pursuant to Tennessee Code Annotated section 40-30-217(a)(2).[2]

The trial court denied the motion to reopen, finding that the evidence presented by the petitioner, even if considered "new scientific evidence," did not establish his actual innocence of the murders for which he was convicted. The Court of Criminal Appeals affirmed the trial court's denial of the motion to reopen and we granted permission to appeal. In this Court, the petitioner presents three issues for our review: First, he argues that the Wechsler Adult Intelligence Scale-III test should be considered "new scientific evidence" pursuant to section 40-30-217(a)(2). Second, he argues that the clear statutory language "actually innocent of the offense" in section 40-30-217(a)(2) should be construed to mean "actual innocence of or ineligibility for the death penalty." And third, he asserts that the Tennessee statute prohibiting the execution of mentally retarded capital offenders, Tenn. Code Ann. § 39-13-203, should be applied retroactively, thereby entitling him to a reduced sentence.

After hearing oral argument in April 2001, this Court requested that the parties file supplemental briefs addressing the additional issue of whether executing a mentally retarded defendant would violate either the Eighth Amendment of the United States Constitution or Article I, section 16 of the Tennessee Constitution. The majority today holds first, that section 39-13-203 has prospective application only and therefore does not serve to relieve the petitioner from his sentence. The majority is entirely correct in this decision, and I concur in that part of the opinion. However, for the reasons set forth below, I disagree with the majority's conclusions regarding both procedural and substantive matters in this case.

---

[2] The statute allowing the petitioner to reopen a previous post-conviction petition provides in pertinent part:

(a)     A petitioner may file a motion in the trial court to reopen the first post-conviction petition only if the following applies:
        (1)     The claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. Such motion must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial; or
        (2)     The claim in the motion is based upon new scientific evidence establishing that such petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or
        (3)     The claim asserted in the motion seeks relief from a sentence that was enhanced because of a previous conviction and such conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid, in which case the motion must be filed within one (1) year of the finality of the ruling holding the previous conviction to be invalid; and
        (4)     It appears that the facts underlying the claim, if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced.
(b)     The motion must set out the factual basis underlying its claims and must be supported by affidavit. The factual information set out in the affidavit shall be limited to information which, if offered at an evidentiary hearing, would be admissible through the testimony of the affiant under the rules of evidence. The motion shall be denied unless the factual allegations, if true, meet the requirements of subsection (a).

# I. PROCEDURAL ANALYSIS UNDER THE
## POST-CONVICTION PROCEDURE ACT

Although largely overlooked by the majority, this case presents several significant procedural issues concerning the ability to reopen a post-conviction petition under Tennessee Code Annotated section 40-30-217(a). Despite the fact that the petitioner filed his claim solely pursuant to subsection (a)(2), the majority does not address this issue on its merits. Invoking the doctrine of fundamental fairness, the majority instead concludes that the petitioner may reopen his petition under subsection (a)(1). Because the petitioner is not constitutionally entitled to reopen his post-conviction petition, but may do so only when the statute permits its reopening, I would deny his petition for failing to satisfy any of the statutory requirements for reopening his post-conviction petition.

## A. TENNESSEE CODE ANNOTATED SECTION 40-30-217(a)(1)

Today, the majority has decided that the petitioner may file a new motion to reopen pursuant to subsection (a)(1). In so deciding, the majority has fashioned a unique procedure to provide the petitioner this avenue for relief. First, the Court has improperly addressed a constitutional issue that has been *waived* because the petitioner failed to raise it in his original post-conviction petition. Nevertheless, by ordering the parties to supply supplemental briefing on this constitutional issue, the Court has excused the waiver, addressed the substantive issue, and created a "final appellate ruling establishing a constitutional right." The petitioner is now being allowed to refile his motion to reopen pursuant to subsection (a)(1), basing his claim on the majority's decision today.

However, the majority overlooks a fundamental procedural flaw in its analysis: according to our unanimous holding in State v. West, 19 S.W.3d 753 (Tenn. 2000), once an issue has been waived by a petitioner, the Court *lacks the authority* to excuse that waiver, see also Tenn. Code Ann. § 40-30-206(g); Tenn. Sup. Ct. R. 28, § 3(B). The unanimous order previously entered cannot be held to have placed the constitutional issue properly before this Court. For the reasons that follow, the constitutional issue should be dismissed, and the petitioner must seek to reopen his post-conviction petition on other grounds.

In 1995, Van Tran filed his petition for post-conviction relief. He raised numerous and various claims, including an allegation that he was mentally retarded and therefore *statutorily* ineligible for the death penalty under section 39-13-203. The trial court conducted an evidentiary hearing in 1997, and the petitioner was provided with a full, fair, and meaningful "opportunity to present proof and argument on the petition for post-conviction relief." Cf. House v. State, 911 S.W.2d 705, 714 (Tenn. 1995); Tenn. Code Ann. § 40-30-206(h). Based on all the evidence presented, the trial court found the petitioner's claims of mental retardation to be without merit and subsequently dismissed his petition.

Despite having a full, fair, and meaningful opportunity to be heard in 1997, the petitioner never raised the issue of whether execution of mentally retarded persons violates Article I, section 16 of the Tennessee Constitution. In fact, he did not even assert this issue in the current proceeding

to reopen until he applied for permission to appeal to this Court. Where a petitioner fails to raise an issue, despite having had the opportunity to do so, that issue is deemed waived under the Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-206(g) (1997).

Because the petitioner has previously waived the substantive constitutional issue before us now, the Post-Conviction Procedure Act does not permit him, outside of the exceptions listed in the statute, to assert that issue in any subsequent proceeding. The majority today appears to overlook the fact that petitioner's previous waiver of the substantive constitutional issue renders this Court without statutory authority to grant relief to the petitioner based on this issue under the post-conviction statutes. Consequently, because the substantive constitutional issue is not properly before the Court, the majority has inappropriately used subsection (a)(1) to give the petitioner an opportunity to avoid his capital sentence.

Importantly, I do not find that our previous order requesting additional briefing on this issue has effectively excused the petitioner's previous waiver. Once an issue has been waived by a defendant in the post-conviction context, this Court possesses no authority, whether by statute, rule, or the plain error doctrine, to excuse that waiver in order to reach the merits of a claim. See West, 19 S.W.3d at 756-57.[3] Consequently, to the extent that our previous order requesting additional briefing could be construed as excusing the petitioner's waiver of that issue, the order was beyond the scope of our authority under the Post-Conviction Procedure Act. Under no set of circumstances can our previous order be construed to place the substantive constitutional issue properly before the Court for resolution on its merits.

Therefore, in accordance with the Post-Conviction Procedure Act and our previous holding in West, I find that the constitutional issue presently addressed by the Court has been previously waived by the petitioner and is beyond the authority of this Court to review. Because we also lack the authority to excuse the petitioner's waiver, we are likewise without authority to address the petitioner's constitutional claim on its merits as the majority has done today. Accordingly, I would hold that the substantive constitutional issue should be dismissed, thereby prohibiting the petitioner from filing a future motion to reopen under subsection (a)(1).

### B. TENNESSEE CODE ANNOTATED SECTION 40-30-217(a)(2)

Without any explanation, the majority asserts that a motion to reopen may be based on a claim involving either a "new legal issue" or new scientific evidence establishing that the petitioner

---

[3] The majority seems to assert that because this Court has never addressed the applicability of these doctrines in the context of a motion to reopen, the holding in State v. West applies only to issues raised for the first time on post-conviction appeal. Nevertheless, this interpretation is contrary to our specific language in West applying our holding to all proceedings falling within the Post-Conviction Procedure *Act* in effect at the time West filed his petition, as well as to "proceedings brought under the Post-Conviction Procedure *Act* currently in force." West, 19 S.W.3d at 757 (emphasis added).

is actually innocent of the offense for which he or she was convicted.[4]  Presumably, the majority has used the language "new legal issue" as a paraphrase for the precise statutory language of section 40-30-217(a)(1), which allows a petitioner to base a claim in a motion to reopen based upon a "final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial."

Alternatively, as the majority has recognized, the petitioner may file a motion to reopen based on a claim of new scientific evidence establishing actual innocence of the *offense or offenses for which the petitioner was convicted*, Tenn. Code Ann. § 40-30-217(a)(2).  Instead, the petitioner in this case has filed his motion to reopen presumably pursuant to subsection (a)(2), alleging that the WAIS-III provides new scientific evidence establishing his mental retardation, thereby rendering him actually innocent *of his capital sentence*.  The majority never discusses the propriety of the petitioner's claim, specifically whether the petitioner has indeed satisfied the strict requirements for reopening a post-conviction petition under section 40-30-217(a)(2).  Because this Court has never before considered the proper standard governing the admissibility of "new scientific evidence," further inquiry is necessary to determine whether the petitioner has at all satisfied the strict requirements for reopening a post-conviction petition under section 40-30-217(a)(2).  More importantly, I cannot accept the petitioner's expanded definition of the phrase "actual innocence of the offenses for which he was convicted" to include innocence of or ineligibility for the death penalty.  This interpretation not only neglects the plain, unambiguous language of the statute, but, if relying on the United States Supreme Court's decision in Sawyer v. Whitley, 505 U.S. 333 (1992), also ignores that the General Assembly has adopted a more narrow definition of the "actual innocence" exception in section 40-30-217(a)(2) than was adopted by the Sawyer Court.  Consequently, for the reasons that follow, I would deny the petitioner's motion to reopen for failing to satisfy any of the procedural requirements.

## 1. New Scientific Evidence

The Post-Conviction Procedure Act of 1995 does not define "new scientific evidence" as used in Section 40-30-217(a)(2).  It seems to me that two reasonable constructions of the phrase are possible.  First, the language could be narrowly construed to mean only scientific evidence which either was not developed or was not in existence at the time of the petitioner's original post-conviction proceeding.  Alternatively, the language could be given a broader construction by including scientific evidence which, although in existence, was not available to the petitioner at the time of his original post-conviction proceeding by the exercise of due diligence.

I would give the statutory language the broader construction because I believe that it more nearly effectuates the intent of the General Assembly.  While this legislation was being considered by that body, Chairman Frank Buck of the House Judiciary Committee remarked, "When some

---

[4] Moreover, although not applicable to this case, a petitioner may also assert a claim in a motion to reopen "seeking relief from a sentence that was enhanced because of a previous conviction . . . and the previous conviction has subsequently been held to be invalid."  Tenn. Code Ann. § 40-30-217(a)(3).

scientific test comes back and proves people to be innocent, there always ought to be some method by which that wrong is corrected. Always." 99th General Assembly, 1st Sess., House, Tape #2, H.B. 0001 (Mar. 29, 1995) (remarks of Rep. Buck).

Regardless of the construction given the phrase, such evidence must be admissible under the applicable Tennessee Rules of Evidence as required in Section 40-30-217(b) ("The factual information set out in the affidavit shall be limited to information which, if offered at an evidentiary hearing, would be admissible through the testimony of the affiant *under the rules of evidence*.") (emphasis added). The specific rules of evidence that govern the issue of admissibility of scientific proof in Tennessee are rules 702[5] and 703.[6] See, e.g., McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 264 (Tenn. 1997). The rules together necessarily require a determination as to the scientific validity or reliability of the evidence. See id. at 265. In short, evidence will be admissible if it is scientifically reliable or valid. Id. Several non-exclusive factors with which courts can determine reliability include the following:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

Id. (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)).

In my view, Van Tran's latest I.Q. scores may not be presumed "new scientific evidence" without consideration of the validity or reliability of the test as required by our evidentiary rules and procedures. Although I am of the opinion that the petitioner is not entitled to an evidentiary hearing on his motion to reopen his post-conviction petition for the reasons contained in this dissent, if a hearing is to be held, then it is clear that the petitioner will be required to show by clear and convincing evidence that: (1) the WAIS-III test was not reasonably available to him at the time of his original post-conviction petition; (2) the updated version of the I.Q. test is qualitatively different from its predecessor such that this updated version is able to provide a more accurate measurement

---

[5] Rule 702 provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise."

[6] Rule 703 provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."

of the petitioner's true intellectual abilities;[7] and (3) the WAIS-III test provides a valid or reliable measurement of the petitioner's I.Q.

## 2. *The Meaning of "Actually Innocent of the Offense"*

Assuming *arguendo* that the test results from the WAIS-III do constitute "new scientific evidence," the petitioner must nevertheless demonstrate that these results establish his actual innocence "of the offense or offenses for which [he] was convicted." The petitioner does not argue that his alleged mental retardation proves his innocence of his underlying crime of murder; rather, he urges this Court to adopt an expanded meaning of this phrase to include "actual innocence of or ineligibility for the *death penalty*." As support, the petitioner cites the United States Supreme Court's decision in Sawyer v. Whitley, 505 U.S. 333 (1992), where the Court held that a prisoner could establish his actual *sentencing* innocence if the prisoner shows by clear and convincing evidence that, absent a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law. Id. at 336.

### The Proper Interpretation of Tennessee Code Annotated
### Section 40-30-217(a)(2)

If the petitioner's broad definition of "actually innocent of the offense or offenses for which the petitioner was convicted" were adopted to include "innocent of capital punishment," such a judicial construction would clearly and unduly expand the statute's coverage beyond its intended scope. A cardinal rule of statutory construction is that courts should seek to ascertain and give effect to the intention and purpose of the General Assembly.

The General Assembly has explicitly qualified the term "actually innocent" in subsection (a)(2) with the clause, "*of the offense or offenses for which the petitioner was convicted*," (emphasis added), leaving little doubt as to what the prisoner must demonstrate. The legislature is presumed to use each word in a statute deliberately, and the use of each word conveys some intent and has a specific meaning and purpose. Browder v. Morris, 975 S.W.2d 308, 311 (Tenn. 1998). Indeed, there seems little question that the legislature applied subsection (a)(2) to mean that the prisoner must demonstrate actual innocence of the crime or crimes for which he was convicted and not merely his sentence. If the legislature had intended the petitioner's broader definition, it would have included the language used in subsection (a)(3), which explicitly allows a prisoner to seek relief "*from a sentence that was enhanced.*" (emphasis added).

This interpretation is consistent with the repeated usage within the Post-Conviction Procedure Act of the terms "offense," "sentence," and "conviction." It is a general rule of statutory construction that where the same language is used repeatedly in the same context, it is presumed to contain the same meaning throughout the statute. Cf. Madison Suburban Util. Dist. v. Carson, 191

---

[7] Dr. Adler testified in his affidavit that the WAIS-III "retains the same format as its predecessor" but has "developed new norms."

Tenn. 300, 305, 232 S.W.2d 277, 279 (1950). Significantly, these terms are used according to their ordinary and well-known meanings, as evidenced both by clarifying language in the statute and by their use both in the disjunctive and in the conjunctive. A prime example of our legislature using the terms "offense" and "sentence" according to their separate and distinct meanings is found in section 39-13-203(c), which requires the court to determine whether a defendant is mentally retarded "at the time *of the offense of first degree murder*." (emphasis added). Moreover, in subsection (d) of this same provision, if a defendant found guilty of first degree murder is also found to have been mentally retarded at the time of the offense, then the jury "shall fix the punishment in a separate sentencing proceeding." See also Tenn. Code Ann. § 40-30-220(a) (requiring this Court to set an execution date upon affirming a conviction *and* sentence of death on direct appeal) (emphasis added); Tenn. Code Ann. § 40-30-203 ("Relief under this part shall be granted when the conviction *or* sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee . . . .") (emphasis added).

Accordingly, it is clear that the General Assembly intended the term "offense" to mean nothing more than the underlying crimes for which the petitioner was convicted. See, e.g., Hodge v. State, No. 03C01-9708-CR-00332, 1998 WL 283100, at *1 (Tenn. Crim. App. June 3, 1998) (rejecting defendant's attempts to prove mental incompetency by introducing mental health records dating back to 1966 but only first discovered in 1996 as failing to establish "actual innocence" of the offenses for which the defendant was convicted). This interpretation fits most logically within the Act as a whole. It is difficult to conceive that the legislature would distort the ordinary definition of the term in one subsection of the statute but to clearly apply its plain meaning in all other provisions. Consequently, to prevent such an anomalous interpretation, subsection (a)(2) must be construed to require the petitioner to prove his actual innocence of the crimes for which he was convicted.

### *Sawyer v. Whitley* and "Actual Innocence"

The petitioner urges this Court to adopt the United States Supreme Court's analysis in Sawyer v. Whitley, 505 U.S. 333, 338 (1992), thereby expanding the definition of "actually innocent of the offense" in section 40-30-217(a)(2) to include "innocent of the death penalty." Although we may look to federal interpretation of similar federal laws for guidance in enforcing our own statutes, we are neither bound by nor limited by federal law when interpreting our Post-Conviction Procedure Act. Indeed, even assuming that the United States Supreme Court's application of federal habeas law is even remotely persuasive to this Court's interpretation of the Tennessee Post-Conviction Procedure statute, it is important to note at the outset that our General Assembly adopted a more narrow definition of the "actual innocence" exception in section 40-30-217(a)(2) than was relied on by the Sawyer Court.

In Sawyer, the defendant alleged that a fundamental miscarriage of justice would occur absent federal review of his abusive and successive federal habeas corpus claims on the merits. He argued that as a result of the ineffective assistance of counsel, certain evidence was withheld from the jury during the sentencing phase of his trial. Sawyer, 505 U.S. at 338. The defendant asserted

that because this evidence was unconstitutionally kept from the jury, he was ineligible for the death penalty and therefore actually innocent of his capital sentence.

Addressing the meaning of "actual innocence,"[8] the Court concluded that "actual innocence" means "innocent of death" and is a "very narrow exception . . . subject to determination by relatively objective standards." Id. at 341. Nevertheless, the Court found the "actually innocent" exception inapplicable because the psychological evidence allegedly withheld from the jury did not relate to his guilt or innocence of the crime or to the aggravating factors found by the jury that made him eligible for capital punishment. Id. at 348-49.

However, under our General Assembly's more narrow definition of the phrase "actually innocent," a petitioner who files a motion to reopen a post-conviction petition based on new scientific evidence is required to demonstrate actual innocence of the underlying crimes for which he was convicted. Courts interpreting similarly worded statutes have also declined to expand the plain meaning of the language to allow a petitioner relief from a capital sentence. For example, federal habeas corpus law has been recently amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 105, 110 Stat. 1214 (amending 28 U.S.C. § 2255[9]), to allow a prisoner to file a second habeas petition only if "newly discovered evidence . . . would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant *guilty of the offense.*" Relying upon this Congressional amendment, the Seventh Circuit has denied a prisoner's attempt to file a successive section 2255 motion for merely asserting his actual *sentencing* innocence rather than his innocence of his underlying crime. As the court explained,

> The "actual innocence" exception of the prior law was judge-made, and so its contours were appropriately judge-fashioned and permissibly judge-expanded. The exception in the new law is graven in statutory language that could not be any clearer. . . . [T]he absence of any indication in the legislative history that "offense" was being used in some special sense different from its ordinary meaning [makes it] highly unlikely that Congress intended the word to bear a special meaning.

Hope v. United States, 108 F.3d 119, 120 (7th Cir. 1997); see also Greenawalt v. Stewart, 105 F.3d 1287, 1287-88 (9th Cir. 1997).

---

[8] The term "actual innocence" as used in federal jurisprudence has its origins in a trio of 1986 United States Supreme Court cases addressing the exceptions under which a habeas petitioner could have the merits of a procedurally barred claim heard. Specifically, the Court held in Murray v. Carrier, the second case in the trilogy, that to prevent a "miscarriage of justice," "where a constitutional violation has probably resulted in the conviction of one who is *actually innocent*, a federal habeas court may grant the [petitioner's abusive, successive, or defaulted habeas corpus writ] even in the absence of a showing of cause for the procedural default." 477 U.S. 478, 496 (1986) (emphasis added).

[9] Prior to the amendments, section 2255 originally provided in pertinent part, "The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." 28 U.S.C. § 2255 (1994).

Consequently, I reject the petitioner's submission for a broader interpretation of the "actually innocent" exception as used by the General Assembly in section 40-30-217(a)(2). Because the petitioner has not met the standard demonstrating that the WAIS-III test results establish his actual innocence of the crime of first degree murder, I would deny his motion to reopen his post-conviction petition on procedural grounds alone.

## C. CONSIDERATIONS OF FUNDAMENTAL FAIRNESS

The majority holds that considerations of "fundamental fairness" dictate that the petitioner have a meaningful opportunity to raise his substantive constitutional claim. Declining to be bound by what it feels are the "technical" mandates of the Post-Conviction Procedure Act and Supreme Court Rule 28 governing waiver of issues, the majority has now given the petitioner an evidentiary hearing, even though the petitioner has never been statutorily entitled to receive this hearing in the first instance. Nevertheless, the majority grants the petitioner an evidentiary hearing so as to provide him "due process of law." I disagree because in my view, the petitioner has already been fully afforded due process of law.

Until today's unfortunate change in the law, no defendant has previously possessed a federal or state constitutional right to collaterally attack his or her conviction in state court. Instead, as this Court has often recognized, the "state may erect reasonable procedural requirements for triggering the right to [such] an adjudication." See Burford v. State, 845 S.W.2d 204, 207-08 (Tenn. 1992). Indeed, the state may even "terminate a [post-conviction] claim for failure to comply with a reasonable procedural rule without violating due process rights." Id. at 208 (citing Logan v. Zimmerman Brush Co., 455 U.S. 422, 437 (1982)). The only due process protection afforded a defendant in the post-conviction context is that a procedural rule cannot deny the defendant an "'*opportunity* to be heard at a meaningful time and in a meaningful manner.'" See House v. State, 911 S.W.2d 705, 711 (Tenn. 1995) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)) (emphasis in original). So long as the policies reflected in a procedural requirement afford the defendant a fair and reasonable opportunity to present a claim, then the defendant may not assert that his due process rights have been violated. See Burford, 845 S.W.2d at 208.

I cannot agree that considerations of fundamental fairness dictate that we bypass the statutory requirements for obtaining a hearing under the Post-Conviction Procedure Act. First, the petitioner cannot establish his substantive eligibility for a hearing under any subsection of Tennessee Code Annotated section 40-30-217(a), and I know of no authority that permits a court to reopen a post-conviction petition when the defendant does not meet any of the statutory criteria necessary for reopening. Indeed, I find it somewhat anomalous to conclude, as the majority apparently does today, that due process of law somehow entitles the petitioner an opportunity to reopen his post-conviction petition, even though he is not entitled to such a hearing under the statute, and even though due process would not compel the legislature to provide for such a hearing in the first instance. Given the sweeping nature of the majority's new "fundamental fairness" doctrine, I am concerned whether the statutory requirements to receive a post-conviction hearing retain any meaning at all.

But even if due process were to allow a hearing when the petitioner did not meet the statutory requirements for obtaining a hearing, I disagree that considerations of fundamental fairness are applicable. First, the petitioner *has not been denied* a meaningful opportunity to be heard on his substantive constitutional claim. Significantly, at his 1997 post-conviction hearing, the petitioner was not restricted by the trial court from raising the substantive constitutional issue, and the record contains no indication that he tried to raise this issue but was inappropriately limited in his ability to present evidence to support his claims for relief. Indeed, though not constitutionally required, the petitioner was also afforded the assistance of counsel in asserting and litigating his claims. As such, the petitioner received everything that "fundamental fairness" requires him to receive: the *opportunity* to be heard on his claim. The majority's holding to the contrary notwithstanding, the petitioner's own failure to present the claim as a basis for relief is not tantamount to his being denied the opportunity to present the claim.

Second, unlike all of our previous cases invoking the "fundamental fairness" doctrine in the post-conviction context, the petitioner's failure to raise the substantive constitutional claim was not due to circumstances beyond his own control. In previous cases where this Court has granted a post-conviction hearing based upon due process grounds, the defendant was confronted with circumstances beyond his control that prevented him from asserting a claim. See Williams v. State, 44 S.W.3d 464 (Tenn. 2001); State v. Nix, 40 S.W.3d 459 (Tenn. 2001); Seals v. State, 23 S.W.3d 272 (Tenn. 2000); Watkins v. State, 903 S.W.2d 302 (Tenn. 1995); Burford v. State, 845 S.W.2d 204 (Tenn. 1992). In this case, however, the ability to present and litigate the substantive constitutional issue was entirely within the petitioner's own control. Consequently, I disagree with the majority that "fundamental fairness" now requires that the petitioner be given a second bite at this constitutional apple.

## II. SUBSTANTIVE CONSTITUTIONAL ANALYSIS

Nevertheless, even granting the dubious propositions that the substantive constitutional issue is properly before the Court and that the General Assembly intended for the meaning of "actual innocence of the offense" to include ineligibility for the death penalty, the petitioner must still show that his alleged mental condition places him among a class of persons who are ineligible to receive a capital sentence. To this end, the petitioner advances two arguments: (1) that Tennessee Code Annotated section 39-13-203, which proscribes the sentencing of mentally retarded persons to death, should be applied retroactively to prohibit his execution, and (2) that both the Eighth Amendment to the United States Constitution and Article I, section 16 of the Tennessee Constitution bar his execution as cruel and unusual punishment.

As a threshold matter, I agree with the majority that section 39-13-203 is not properly applied retroactively to relieve this defendant of his capital sentence. Apart from questions as to the constitutional authority of the General Assembly to retroactively relieve a defendant of a final and valid sentence, cf. State ex rel. v. McClellan, 87 Tenn. 52, 55, 9 S.W. 233, 234 (1888), I find no evidence that clearly demonstrates the legislature's intent to have this statute operate retroactively. Consequently, if the petitioner is entitled to have his post-conviction petition reopened, it can only

be because the Constitution of the State of Tennessee forbids his execution.[10]

### A. *THE NATURE OF THE CONSTITUTIONAL ISSUE BEFORE THE COURT*

Initially, it is of vital importance to understand the precise constitutional question before the Court. Contrary to the majority's formulation, the issue in this case is *not* simply whether the Tennessee Constitution prohibits the execution of mentally retarded persons. Under some well-settled circumstances, it already does, and I do not understand these well-settled circumstances to be at issue here.

This Court has previously held that the Constitution prohibits the execution of a defendant within "the borderline mentally retarded range" if, because of that mental condition, the defendant lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. In State v. Laney, 654 S.W.2d 383 (Tenn. 1983), this Court, speaking through then Justice Drowota, denied the defendant's challenge to his capital sentence on the ground that the fact of his low I.Q. rendered the sentence cruel and unusual. In denying that the mere fact of low intelligence alone rendered a capital sentence unconstitutional, the Court held that so long as the mental condition did not affect the defendant's capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, the law would "hold [that] person accountable for his actions." Id. at 389 (citing Graham v. State, 547 S.W.2d 531, 543 (Tenn. 1977)). This Court then upheld Laney's capital sentence upon finding that his I.Q. of seventy-two did not affect his "mental capability to plan, commit and attempt to cover up his involvement in the crime." Id.

As evidenced by Laney, the law is already settled that the Constitution of the State of Tennessee forbids the execution of a mentally retarded defendant under certain circumstances, such as where a defendant's mental condition displaces the following capacities: (1) the *cognitive capacity* to appreciate the consequences of certain action, (2) the *moral capacity* to appreciate the wrongfulness of certain action, or (3) the *volitional capacity* to behave in a lawful manner. See also Penry v. Lynaugh, 492 U.S. 302, 338 (1989) (O'Connor, J.) (stating that the Eighth Amendment does not bar execution, unless a defendant's mental condition affects his or her cognitive, volitional, and

---

[10] The United States Supreme Court has previously held that the Eighth Amendment does not categorically prohibit the execution of mentally retarded defendants, so long as the sentencing authority is able to "consider and give effect to mitigating evidence of mental retardation in imposing sentence, [and make] an individualized determination whether 'death is the appropriate punishment'" in each case. See Penry v. Lynaugh, 492 U.S. 302, 340 (1989). However, the Supreme Court has granted review in Atkins v. Virginia, *cert. granted*, __ U.S. __ (Oct. 1, 2001) (No. 00-8452), to readdress this same issue: "[w]hether the execution of mentally retarded individuals convicted of capital crimes violates the Eighth Amendment." Nevertheless, even if the Supreme Court decides to retain Penry's holding in this context, the Tennessee Constitution could still entitle the petitioner to greater protections than the federal constitution. As such, I agree with the majority that the constitutional analysis in this case should concern only Article I, section 16.

moral capacities).[11]  However, the majority today expands this prohibitional bar well beyond the holding of Laney.  Instead of focusing its rationale on the cognitive abilities of the individual defendant, the majority now expands prior law to render *all* mentally retarded persons, despite the actual cognitive, moral, or volitional abilities possessed by the individual defendant, ineligible for capital punishment.[12]

As such, the issue before the Court is not simply whether the Constitution prohibits the execution of the mentally retarded.  Under some circumstances, it does, and it always has.  Instead, the *real issue* in this case is whether the Tennessee Constitution now also forbids the execution of someone who suffers from a mental condition, but whose condition *does not* affect his or her cognitive, moral, or volitional capacities to commit capital murder.

The majority's decision is a broad expansion of existing law, and one that I believe is unwarranted and will lead to injustice in individual cases.  Instead, I would hold that the Constitution continues to permit the punishment of a defendant who has the cognitive capacity to appreciate that certain action will lead to the death of others, who has the moral capacity to appreciate the wrongfulness of murder, and who otherwise has the volitional capacity to behave in a lawful manner.  For the reasons given below, I respectfully dissent from the conclusion that the Tennessee Constitution prohibits the petitioner's execution, or, consequently, that he has shown that he is "actually innocent of the offense" under section 40-30-217(a)(2).

## B.  APPLICATION OF ARTICLE I, SECTION 16

Any interpretation of a constitutional provision necessarily begins with its language.  Article I, section 16 of the Tennessee Constitution provides that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  We have previously recognized the textual similarity of this provision to that of the Eighth Amendment, and as such, we have adopted the analysis used by the United States Supreme Court in Gregg v. Georgia, 428 U.S. 153, 173 (1976), for determining whether a punishment is cruel and unusual under the Tennessee Constitution.  See State v. Black, 815 S.W.2d 166, 189 (Tenn. 1991).  According to this standard, the petitioner is entitled to a reduced sentence only if he can show that his punishment is cruel and unusual in light of three factors: "First, does the punishment for the crime conform with contemporary standards of decency?  Second, is the punishment grossly disproportionate to the

---

[11]  The majority states that I cite no authority for my analysis that the Constitution does not categorically prohibit execution of persons possessing the cognitive, moral, and volitional capacities to commit crime.  Therefore, through inclusion of this footnote, I hope to draw the majority's attention to the fact that I have cited both Laney and Penry as binding and persuasive authorities for this proposition.

[12]  However, the majority recognizes that mental retardation exists in degrees, some much less severe than others, and that it acknowledges that persons with mild retardation are certainly capable of attaining some measure of accomplishment in academia, work, and society.  If this is true, and I believe that it is, then one must question why a mildly retarded person cannot also possess the cognitive, moral, and volitional capacities necessary to commit crime and be punished.  The majority's rationale is silent on this apparent contradiction.

offense?  Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective[?]"  Id. (citations omitted).  I disagree that the petitioner has successfully met his burden under any of these three criteria.[13]

### 1. Penological Objectives Served by the Punishment

Taking these inquiries in reverse order, the legitimate penological objectives of capital punishment in this state, retribution and deterrence, see, e.g., State v. Keen, 31 S.W.3d 196, 217 (Tenn. 2000), are not undermined so long as the defendant possesses the capacities to appreciate that certain action will lead to the death of others, to appreciate the moral wrongfulness of murder, and to behave in a lawful manner.  While the mental condition of some offenders may significantly impair these capacities, I disagree that this conclusion invariably follows in all cases.  Consequently, where these capacities remain largely unaffected by the defendant's mental condition, the Constitution cannot bar capital punishment on the ground that no penological goal supports it.

### Retribution and Moral Blameworthiness

As for the former objective, the retributive value of capital punishment is closely tied to the defendant's culpability, as evidenced by the Supreme Court's statement that retribution is an appropriate consideration so long as the punishment is tailored to the defendant's "personal responsibility and moral guilt."  See Enmund, 458 U.S. at 801.  As one member of the present majority has noted with regard to retribution in the capital context, this justification for punishment may be characterized as "the need to offset a criminal act by a punishment of equivalent 'moral quality.'"  See Van Tran, 6 S.W.3d at 277 (Birch, J., dissenting) (internal quotation marks omitted).  When viewed in this light, the retributive aspect of capital punishment "is an expression of society's moral outrage at particularly offensive conduct.  This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs."  Gregg, 428 U.S. at 183.

The majority takes substantial issue with the notion that some mentally retarded offenders can possess any moral culpability for their criminal actions, and it holds that the mere status of mental retardation is sufficient to render a defendant utterly incapable of acting with the level of personal culpability that would justify a capital sentence.  Indeed, while the majority notes that mental retardation exists in several degrees of severity, ranging from mild to profound, it makes no practical distinction between these degrees in its analysis of moral blameworthiness.  Taken to its logical extreme, the majority's rationale posits that the mere label of mental retardation is sufficient to remove any notion that a defendant can possibly be morally blameworthy.  This conclusion cannot invariably follow, because it ignores the differing mental capacities, life experiences, and general abilities possessed by individuals within the majority's large and diverse class of persons.

---

[13] The majority supposes that I have overlooked the fact that the constitutional inquiry in this case is composed of examination of three separate factors.  I have, however, acknowledged this fact and have provided my own analysis of all three of these factors.

Directly contradicting conclusions similar to those advanced by the majority in this case, Justice O'Connor examined the record in <u>Penry</u>—a record, incidentally, that was more fully developed and supplemented than the record in this case—and concluded the following as to the abilities of this class of defendants:

> Mentally retarded persons are individuals whose abilities and experiences can vary greatly. . . . In addition to the varying degrees of mental retardation, the consequences of a retarded person's mental impairment, including the deficits in his or her adaptive behavior, "may be ameliorated through education and habilitation." Although retarded persons generally have difficulty learning from experience, some are fully "capable of learning, working, and living in their communities." *In light of the diverse capacities and life experiences of mentally retarded persons, it cannot be said on the record before us today that all mentally retarded people, by definition, can never act with the level of culpability associated with the death penalty.*

492 U.S. at 338-339 (citations omitted) (emphasis added).

Therefore, while the majority's conclusions may follow in some, if not many, cases, these generalities are overbroad at best, and, at worst, they can lead to manifest injustice in individual cases. Indeed, if one needs proof of the veracity of this proposition, one should look no farther than to the petitioner's case before us now. Assuming that the petitioner falls within the majority's new class of capitally ineligible defendants, a tragic error will occur if the majority's assumptions as to the general abilities of this class are given effect in this case.

Let only three facts be submitted for candid and objective consideration: First, the petitioner has not alleged, either in his petition or through accompanying affidavits, that his mental condition affected his ability to understand what would happen if he pulled the trigger of a loaded pistol. In fact, no evidence has ever suggested that Van Tran was unaware that people could die if shot in the throat and head, as was the case with Kai Yin Chuey. Instead, the petitioner's original description of the events provides considerable evidence that he was acutely aware of the consequences of his deadly actions, and a different score on an updated I.Q. test simply does not change this conclusion.

Second, the petitioner has not alleged, either in his petition or through accompanying affidavits, that his mental condition affected his ability to understand that it was morally wrong to murder or that it otherwise affected his ability to kill with premeditation or deliberation. Van Tran's awareness of the moral wrongfulness of his conduct can be seen not only in his six-month flight and evasion of authorities, but also from the fact that he knowingly gave a false name to police officers upon his arrest in Houston. Moreover, no evidence from any proceeding has ever suggested that Van Tran was somehow incapable of forming an intent to kill. To the contrary, two members of the present majority closely reviewed the record in 1993 and specifically found that the murder of Kai Yin Chuey "involved the *intentional* and senseless killing of a helpless, elderly victim during a robbery." <u>Van Tran</u>, 864 S.W.2d at 482 (emphasis added). I agree with their assessment.

Third, and finally, the petitioner has not alleged, either in his petition or through accompanying affidavits, that his mental condition affected his ability to behave in a lawful manner or that it otherwise compelled him to execute Kai Yin Chuey. Indeed, before his horrific criminal episode, he apparently had no criminal record, and I am aware of no similar conduct since that day in 1987. Surely, the majority must concede that a different score on a revised I.Q. test does not change the fact that Van Tran is capable of behaving in a lawful manner.

Given that Van Tran has not even alleged that his cognitive, moral, or volitional capacities were affected by his mental condition, it is difficult to understand that this Court could conclude that he is somehow not morally blameworthy for his crimes. *In fact, it is precisely because he possesses these capacities that he is morally blameworthy for the murder of Kai Yin Chuey.* While I agree that in some cases mental retardation will substantially affect a defendant's cognitive, moral, or volitional capacities to such an extent that capital punishment would be unconstitutional, Van Tran's case illustrates perfectly that the offender's mental condition does not *invariably* affect these processes. As to these offenders, then, retribution remains a valid and material penological justification supporting capital punishment.[14]

Because I am able to assert that the petitioner has always possessed the cognitive, moral, or volitional capacities to commit first degree murder, the majority posits that I have somehow engaged in an improper "fact-finding exercise of reviewing this case." My conclusions regarding the petitioner's relative capacities were not found by me on some "fact-finding exercise"; they are implicit in the jury's verdict and sentence of death. I am fully confident that these findings are correct, because the petitioner has never contested their veracity in any proceeding, not even before this Court today. Moreover, the record of that case was carefully reviewed by the Court of Criminal Appeals and by this Court, and each court necessarily concluded that the petitioner did possess the necessary cognitive, moral, and volitional capacities to commit first degree murder, as evidenced by their affirmance of his convictions. Therefore, while the majority has taken a different approach to constitutional adjudication, I am certain that my uncontested assertions as to the petitioner's cognitive, moral, and volitional capacities are the result of legitimate, and constitutionally accepted, methods of appellate review.

*Deterrence of Intentional or Reckless Conduct*

With regard to deterrence as an objective of capital punishment, the majority notes that mental retardation may prevent a defendant from fully appreciating the consequences of actions. Again, while this proposition may be true in some cases, I see no evidence that it is invariably true. We have recently explored in detail how deterrence is affected by sentencing behavior, and we recognized that punishment can work to deter intentional, knowing, or reckless conduct. See State v. Hooper, 29 S.W.3d 1, 11 (Tenn. 2000); see also Enmund, 458 U.S. at 798-99 ("We are quite

_____

[14] Given the majority's emphatic conclusion that the mental condition of these offenders removes their criminal culpability, how can the majority justify imposing *any* type of punishment, capital or not, upon mildly retarded offenders for their crimes?

-18-

unconvinced, however, that the threat that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken."); Tison v. Arizona, 481 U.S. 137, 158-59 (1987) (expanding the culpability requirements of Enmund to include "major participation in the felony committed, combined with reckless indifference to human life"). Therefore, where the defendant's mental condition does not affect his or her capacity to intend that death follow from certain actions, then deterrence remains permissible justification in the capital context. Indeed, deterrence would also be a permissible justification even if the victim's death was only the result of reckless conduct.

Even assuming that the petitioner possesses an I.Q. of sixty-five, however, no evidence has ever been presented that he was incapable of forming an intent to kill or was otherwise unable to murder with premeditation and deliberation. As I acknowledged earlier, this Court has previously found that the murder of Kai Yin Chuey was the result of a specific intent to kill. See Van Tran, 864 S.W.2d at 482. Moreover, the petitioner's major participation in the felony, even if not the result of a specific intent to kill, was certainly the result of knowing or extremely reckless conduct. With good reason, the law has always supposed that these types of actions can be deterred by punishment. Therefore, when the defendant's mental condition does not prevent him or her from appreciating that death would follow from certain action, then deterrence certainly remains a legitimate penological goal in the capital context.

*Inherent Contradictions in the Majority's Analysis of*
*Penological Justifications*

To avoid the impression that its analysis of penological justifications is without foundation, the majority employs contradictory statements to first justify its holding and then to respond to my review of that holding. For example, the majority first asserts that retribution cannot justify capital punishment because the condition of mental retardation always affects the defendant's ability "to appreciate the concept of blameworthiness," and will "render a mentally retarded offender unable to understand that certain repercussions flow from certain [acts]." In the same vein, the majority states that deterrence is an improper justification because mentally retarded persons, as a class, are "not able to weigh the cost of the criminal act, the consequences of the punishment, or the benefits of alternatives." However, in response to my criticisms of its holding, the majority states, in contradiction to its earlier conclusions, that "we do not hold that the conviction and punishment of a mentally retarded defendant never achieves valid penological goals." Consequently, the very conclusion that the majority went through great effort to dismiss—that retribution and deterrence are not valid penological goals with respect to mentally retarded offenders—is revived when necessary to respond to the obvious shortcomings of its holding.

Given the majority's analysis of this issue, I am left to wonder which conclusion now represents the current state of the law. Notably, if the former conclusion—that mentally retarded offenders, by definition, cannot be morally blameworthy or be deterred from unlawful conduct—is the preferred conclusion, then all punishment, capital or otherwise, must necessarily be unlawful as well. After all, how can any punishment be acceptable if the offender's mental condition invariably

infects his or her moral blameworthiness and ability to appreciate consequences of action?[15] Laney suggests that *no* such punishment could ever be valid, and as such, the majority's faint attempt to limit its holding to capital punishment alone is suspect indeed.

On the other hand, if the latter conclusion—that at least some offenders in this class can distinguish between right and wrong and appreciate the consequences of action—represents the new state of the law, then absolutely no rationale warrants a *categorical* exemption from any punishment based solely on the *fact* of a mental condition. Instead, the punishment determination should be made on an individualized basis, paying close attention to the *effect* that the offender's condition has upon his or her particular cognitive, moral, and volitional capacities, just as I have advocated today. Nevertheless, the majority maintains its categorical exemption even in the face of its admission that retribution and deterrence can serve as legitimate penological justifications in this context, at least for some offenders.

### 2. *The Substantive Proportionality of the Petitioner's Capital Sentence*

The next inquiry is whether a sentence of death is a proportionate penalty to the crime of first degree murder. In State v. Harris, 844 S.W.2d 601 (Tenn. 1992), this Court adopted a two-pronged inquiry, taken substantially from Justice Kennedy's concurring opinion in Harmelin v. Michigan, 501 U.S. 957, 996 (1991), to determine the substantive proportionality of punishment under Article I, section 16. The first inquiry under this test is to compare the sentence with the crime committed to determine whether the "comparison leads to an inference of gross disproportionality." If an inference so arises, then "the analysis proceeds by comparing (1) the sentences imposed on other criminals in the same jurisdiction, and (2) the sentences imposed for commission of the same crime in other jurisdictions." Harris, 844 S.W.2d at 603.

In this case, satisfaction of the first inquiry validates the substantive proportionality of the death penalty, because, as this Court has acknowledged countless times, capital punishment is not disproportionate to the offense of first degree murder. See, e.g., Black, 815 S.W.2d at 190 ("[W]hen a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes." (quoting Gregg, 428 U.S. at 187)). Contrary to the majority's rationale, the mental condition of the defendant found guilty of first degree murder is irrelevant to whether the punishment is substantively proportional to that crime in the abstract, unless that condition leaves the defendant without sufficient cognitive, moral, or volitional capacities to commit the capital crime in the first place. See State v. Middlebrooks, 840 S.W.2d 317, 339 (Tenn. 1992) (stating that substantive proportionality is concerned "only with the imposition of capital punishment for the crime of [capital] murder in the abstract"). As I stated earlier, I am unpersuaded that all defendants within the majority's newly

---

[15] Indeed, I would note that rehabilitation also does not appear to be a valid justification for any type of non-capital punishment. I see no evidence in the record which suggests that mentally retarded persons can be "rehabilitated" to instill concepts of moral blameworthiness and appreciation of consequences where none existed previously. Indeed, if such were the case, then a categorical prohibition would be inappropriate, because retribution and deterrence would then justify the punishment of at least some of these offenders.

formed class are inherently without the cognitive, moral, and volitional capacities to commit capital murder. As to these persons, then, capital punishment remains presumptively proportionate to the crime of first degree murder and, hence, it cannot constitute cruel and unusual punishment for the reason that it is abstractly disproportionate.

*Considerations of the Criminal Justice System*

As further support for its holding that a capital sentence within this context is invariably disproportionate, the majority notes that the mental condition of some defendants may hamper their ability to assist counsel or to make decisions about the course of their defense. The majority further notes that these defendants are less likely to withstand police coercion or pressure, thereby making them particularly vulnerable to involuntary confessions. Presumably, then, because of these factors, the majority concludes that capital punishment in this circumstance constitutes cruel and unusual punishment under Article I, section 16.

I do not necessarily doubt the veracity of the majority's premises as applied to some defendants, but these premises are simply not relevant to the substantive analysis of punishment under Article I, section 16. The constitutionality of the punishment under Article I, section 16 is considered *in the abstract*, separate and apart from the other aspects of the criminal justice system. Cf. Middlebrooks, 840 S.W.2d at 339. If a defendant with mild mental retardation encounters difficulty in the system, other constitutional protections are present to prevent a manifest injustice from occurring.[16] The encountering of any such difficulties, however, has never been considered to render the ultimate punishment unconstitutional. Either a punishment is cruel and unusual, or it is not, and I cannot agree that the majority's perceived shortcomings in the criminal justice system will render a punishment substantively disproportionate under Article I, section 16.

### 3. Contemporary Standards of Punishment

Finally, in examining the remaining prong of the Black test, I disagree that the petitioner has carried his burden in demonstrating that contemporary standards of punishment in this State have so drastically changed since our decision in Laney that it is now unconstitutional to execute those defendants whose mental condition does not affect their cognitive, moral, or volitional capacities. This final examination essentially assesses the "contemporary values [in Tennessee] concerning the

---

[16] These provisions include the protections of the right to a fair trial, the right to counsel, and the privilege against self-incrimination. The majority overlooks the fact that if the mental condition of the defendant prevents the exercise of any of these rights, then punishment will not follow anyway. Without any such showing, however, no justification exists to declare the ensuing punishment cruel and unusual merely because of the possibility that these rights were not intelligently exercised.

Again, if the majority's rationale is taken to its next logical step, how can the majority justify imposing *any* type of punishment, capital or otherwise, upon mildly retarded offenders for their crimes? If capital punishment of mentally retarded persons is substantively disproportionate because these defendants may encounter difficulties in the criminal justice system, why are not other lesser punishments also disproportionate under this same analysis? The difficulties encountered by these defendants are no less when the punishment is life without parole as opposed to death.

-21-

infliction of a challenged sanction." <u>See</u> <u>State v. Howell</u>, 868 S.W.2d 238, 264 (Tenn. 1993) (quoting <u>Gregg</u>, 481 U.S. at 173). This assessment "does not call for a subjective judgment," <u>Gregg</u>, 428 U.S. at 173, and courts look to a variety of "objective indicia that reflect the public attitude toward a given sanction," such as legislative enactments, jury sentencing behavior, prosecutors' decisions, and opinion polls. In examining these contemporary values, however, "[i]t is not the role of this Court to superimpose personal morality in difficult issues, or to act as a good reflex of a democratic society." <u>Black</u>, 815 S.W.2d at 190 (internal quotations and citation omitted).

*Evidence of Contemporary Values in Tennessee*

Although a defendant always has the burden of proving that a societal consensus concerning the punishment at issue has emerged, <u>see</u> <u>Stanford v. Kentucky</u>, 492 U.S. 361, 373 (1989), the petitioner in this case has failed to satisfactorily demonstrate that Tennesseans have arrived at a consensus against executing persons whose mental condition does not affect their cognitive, moral, or volitional capacities to commit murder. The petitioner has brought forward no evidence that juries regularly fail to return a capital sentence against persons whose mental condition does not affect their cognitive, moral, or volitional capacities to commit murder. He has not shown that prosecutors routinely fail to seek the death penalty in eligible cases when the defendant has a mental condition that does not affect his or her cognitive, moral, or volitional capacities to commit murder. Furthermore, the petitioner has cited no opinion polls in this state that demonstrate that the people of this State overwhelmingly believe that it is morally wrong to execute persons whose mental condition does not affect their cognitive, moral, or volitional capacities to commit murder.

In fact, the *only* "objective indicium" presented by the petitioner that Tennesseans have reached a definitive consensus on this issue is the presence of Tennessee Code Annotated section 39-13-203. As the majority correctly notes, the presence of a statute permitting or prohibiting a particular form of punishment is a strong indicator of the public views regarding its use. However, just as the presence of a statute permitting a punishment cannot be viewed in isolation as constitutionally sanctioning the practice, <u>Black</u>, 815 S.W.2d at 188, neither can the isolated presence of a statute prohibiting a punishment also mean that the Constitution now forbids its use.

Importantly, the United States Supreme Court has rejected the view that a single statute, without other evidence of contemporary values, demonstrates a consensus among those represented sufficient to command constitutional change. One year before <u>Penry</u> was decided, the Congress of the United States enacted a provision that specifically provided that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." <u>See</u> 21 U.S.C. § 848(*l*) (1988). Although Congress presumably acts with the full voice and authority of the nation as a whole—and therefore presumably reflects the contemporary values and norms of the nation—the <u>Penry</u> Court did not find that this statute evidenced a national consensus against executing mentally retarded persons. <u>See</u> <u>Penry</u>, 492 U.S. at 394. Instead, the Court gave the mere presence of this national statute virtually no weight at all, and it continued to look elsewhere for evidence of a national consensus on the issue.

In this case, however, the majority takes an approach that is curiously contrary to the well-

-22-

reasoned analysis taken in <u>Penry</u>. Armed only with the presence of a single statute on the issue, the majority declares that Tennesseans have reached a consensus sufficient to justify constitutional change. I simply cannot agree. When a punishment furthers legitimate goals of punishment, and when that punishment is proportional to the offense and to the offender, the mere presence of a statute restricting the use of that punishment cannot be sufficient evidence of the punishment's substantive constitutionality. Indeed, because the majority has no evidence of the public judgment in Tennessee other than the presence of this statute, the practical effect of its holding in this case is to elevate that statutory text to constitutional commandment. In so doing, the majority has essentially bestowed upon the General Assembly the power to constitutionally prohibit punishment under Article I, section 16 through the mere enactment of a single statute. This reasoning is flawed, however, because it ignores the constitutional reality that the people have not given the General Assembly the ultimate power to alter or amend their Charter of government. Instead, the people have expressly reserved that power for themselves. <u>See</u> Tenn. Const. art. I, § 1; art. XI, § 3.

Through the exercise of its legislative power, the General Assembly is always free to prohibit any type of punishment that it deems inappropriate. Indeed, because the legislative power of the state includes the power to define punishment for crime, <u>see</u> <u>Bibbs v. State</u>, 162 Tenn. 646, 649, 39 S.W.2d 1024, 1025 (1931); <u>see also</u> <u>Harris</u>, 844 S.W.2d at 602, the Constitution itself confers upon the General Assembly broad discretion to permit and proscribe different types of punishment. In exercising the legislative power to enjoin a particular punishment, however, it has never been understood that the General Assembly has also effectively declared that punishment to be unconstitutional and, therefore, outside its power to re-enact or amend at a later date should it so desire. To the extent that the majority's holding today, which relies solely upon the presence of a single statute to evidence the public's constitutional judgment, now permits this conclusion to follow, I believe that it represents an unconstitutional interference with the legislative power to fix and define punishment, <u>see</u> Tenn. Const. art. II, § 2, and I cannot join in its decision.

*Use of Other Cognitive Standards in Tennessee*

Ultimately, I am uncertain as to why the majority holds that the mere *fact* of mental retardation is determinative of the constitutional inquiry, rather than looking to the *effect* that the mental condition has upon the defendant. This holding is fundamentally at odds with the law, either constitutional or otherwise, in virtually all other areas in this state. Surely, these other standards must be of some persuasive force to show that Tennesseans have not reached a consensus that the cognitive, moral, or volitional capacities of a defendant are now irrelevant to his or her punishment. Though ignored by the majority, the following is a brief list of examples in which the focus of similar inquiries is upon the *effect* of the defendant's mental condition, and not upon the mere *fact* of the defendant's condition:

The mere *fact* of mental retardation does not prevent a defendant's impending execution. Instead, a court must decide whether the mental condition *affects* the defendant's ability to understand the fact of the impending execution and the reason for it. <u>See</u> <u>Van Tran</u>, 6 S.W.3d at 266.

-23-

The mere *fact* of mental retardation does not prevent a defendant from being found competent to stand trial. Instead, a court must decide whether the mental condition *affects* the defendant's ability to understand the nature and object of the proceedings, to consult with counsel, or to assist in the preparation of his or her defense. See State v. Blackstock, 19 S.W.3d 200, 205 (Tenn. 2000).

The mere *fact* of mental retardation does not prevent a defendant from pleading guilty. Instead, a court must decide whether the mental condition *affects* the defendant's ability to understand the proceedings and to understand the significance and consequences of a particular decision. See Moten v. State, 935 S.W.2d 416, 420 (Tenn. Crim. App. 1996) (citing and quoting Godinez v. Moran, 509 U.S. 389, 401 n.12 (1993)).

The mere *fact* of mental retardation does not prevent a defendant from waiving Miranda rights. Instead, a court must decide whether the mental condition *affects* the defendant's ability to waive those rights intelligently. See State v. Benton, 759 S.W.2d 427, 431 (Tenn. Crim. App. 1988) ("We recognize that no single factor such as age, education, *or even mental retardation* is conclusive on the waiver issue." (emphasis added)).

The mere *fact* of mental retardation does not prevent a person from being a witness. Instead, a court must decide whether the mental condition *affects* the witness's ability to understand the nature of the oath and testify truthfully. See State v. Johnson, 685 S.W.2d 301, 305 (Tenn. Crim. App. 1984).

Indeed, the mere *fact* of mental retardation does not prevent a defendant from being found guilty of first degree murder. Instead, a court reviewing the sufficiency of the evidence must decide whether the mental condition *affected* the defendant's ability to kill with intent or with premeditation and deliberation. See State v. Brown, 836 S.W.2d 530, 537 (Tenn. 1992).

Given that all these circumstances focus upon the *effect* of mental retardation as the relevant characteristic, it is indeed difficult to understand the majority's holding that the mere *fact* of retardation will prevent a defendant from being eligible for capital punishment. Although the General Assembly is free to enact a statute imposing such a *per se* prohibition if it so desires, the Court has now fashioned a new, broad constitutional rule where no such rule has previously existed and where no clear evidence exists to suggest that there is a contemporary societal consensus mandating its recognition. Indeed, only time will tell whether the majority's new constitutional holding founded upon generic assumptions regarding the abilities of *all* mentally retarded persons will work profound changes in other areas of constitutional law as well.

*Evidence of Contemporary National Values*

Because the majority has rejected the notion that it is interpreting the Eighth Amendment in this case, I am uncertain why the majority tries to divine a contemporary *national* standard on this issue. Just as "*American* conceptions of decency" are dispositive in the Eighth Amendment context, see Stanford, 492 U.S. at 492 n.1 (emphasis in original), only that evidence reflecting Tennessee's

contemporary values should be relevant to the analysis under Article I, section 16. Nevertheless, even taking this questionable premise as true, I disagree that any national consensus has emerged that would warrant a change in the meaning of Tennessee's Constitution. As a simple count from the majority's tally reveals, *less than half* of all the death penalty jurisdictions have legislatively prohibited the execution of mentally retarded defendants.[17] The standards by which these prohibitions are measured are not uniform, and at least one jurisdiction bars such executions only when the defendant's subaverage intellectual functioning "substantially impairs one's capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law." See Kan. Stat. Ann. § 21-4623(e) (1995). In my mind, the majority's evidence of a nationwide consensus is simply insufficient to legitimately conclude that Article I, section 16 constitutionally mandates a categorical prohibition on such executions in this state.

## CONCLUSION

In summary, I cannot agree that the petitioner has satisfied any requirements for reopening his post-conviction petition. The petitioner is not constitutionally entitled to reopen his post-conviction petition, and as such, he may do so only when the statute permits its reopening. I would first find that the constitutional issue presently addressed by the Court has been previously waived by the petitioner and is beyond the authority of this Court to review. Because we also lack the authority to excuse the petitioner's waiver, we are likewise without authority to address the petitioner's constitutional claim on its merit as the majority has done today. Accordingly, I would hold that the substantive constitutional issue should be dismissed, thereby prohibiting the petitioner from filing a future motion to reopen under subsection (a)(1).

I would also find that the petitioner's claim to reopen fails under Tennessee Code Annotated section 40-30-217(a)(2). Because this Court has not previously considered the proper standard

---

[17] The majority has also considered non-capital states as evidence of the national consensus on this issue. This type of analysis, however, has been rejected by a majority of the United States Supreme Court as inappropriate for analysis under the Eighth Amendment. In Stanford v. Kentucky, 492 U.S. 361 (1989), wherein the Court refused to find a bar against the execution of persons aged 16 and above, a majority of the Court noted that

> The dissent takes issue with our failure to include, among those States evidencing a consensus against executing 16- and 17-year-old offenders, the District of Columbia and the 14 States that do not authorize capital punishment. *It seems to us, however, that while the number of those jurisdictions bears upon the question whether there is a consensus against capital punishment altogether, it is quite irrelevant to the specific inquiry in this case: whether there is a settled consensus in favor of punishing offenders under 18 differently from those over 18 insofar as capital punishment is concerned. . . . The issue in the present case is not whether capital punishment is thought to be desirable but whether persons under 18 are thought to be specially exempt from it.* With respect to that inquiry, it is no more logical to say that the capital-punishment laws of those States which prohibit capital punishment (and thus do not address age) support the dissent's position, than it would be to say that the age-of-adult-criminal-responsibility laws of those same States (which do not address capital punishment) support our position.

Id. at 370 n.2 (emphasis added). Consequently, in my mind, to the extent that national values are relevant to the inquiry, the proper comparison is more properly limited to those jurisdictions which authorize capital punishment in the first instance.

governing the admissibility of "new scientific evidence," it is inappropriate to assume that the WAIS-III qualifies as such without further inquiry. Moreover, I disagree with the petitioner's interpretation of the language "actual innocence of the offenses for which he was convicted" to include innocence of, or ineligibility for, the death penalty. Such an interpretation ignores the plain meaning of the words themselves; it ignores that the General Assembly has distinguished between the words "offense" and "sentence" in the same statute; and it ignores that the legislature has never used the term "offense" to include the sentence imposed for the underlying crime. Consequently, I am unable to join the majority's decision permitting the petitioner to reopen his post-conviction petition.

Perhaps most importantly, however, I disagree that the Constitution of the State of Tennessee bars the petitioner's execution. Contrary to the majority's holding, Article I, section 16 of the Tennessee Constitution permits the execution of a defendant whose mental condition does not affect the defendant's cognitive capacity to appreciate that certain action will lead to the death of others, the defendant's moral capacity to appreciate the wrongfulness of murder, or the defendant's volitional capacity to behave in a lawful manner. Capital punishment in this context serves legitimate penological goals, because not all defendants in the majority's class are invariably incapable of intending to commit a capital offense, and the punishment is proportional to the crime of first degree murder. Moreover, I have not found sufficient evidence to suggest that the public judgment in Tennessee is categorically against the execution of individuals, who, while possessing mild mental retardation, also possess the cognitive, moral, and volitional capacities to commit first degree murder.

The petitioner in this case has not alleged, either in his petition or through accompanying affidavits, that his mental condition affected his cognitive capacity to appreciate that certain action would lead to the death of Kai Yin Chuey, his moral capacity to appreciate the wrongfulness of murder, or his volitional capacity to behave in a lawful manner. Instead, he seeks to set aside his capital sentence based on the mere *fact* of his mental condition without regard to its *effect*. This reason is simply insufficient in my mind to show the petitioner's "actual innocence of the offense" under Tennessee Code Annotated section 40-30-217(a)(2), even if the majority's interpretation of this provision is appropriate.

For these reasons, I respectfully dissent. Furthermore, I am authorized to state that Justice Holder joins in this dissenting opinion.

_____
WILLIAM M. BARKER, JUSTICE